# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 99-967

JOHN E. SHOFFNER, APPELLANT,

V.

ANTHONY J. PRINCIPI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued December 17, 2001                    Decided    July 30, 2002   )

*Sandra E. Booth*, of Columbus, Ohio, for the appellant.

*Erica M. Dornburg*, with whom *John H. Thompson*, Acting General Counsel; *Ron Garvin*, Assistant General Counsel; *Darryl A. Joe*, Acting Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

*Daniel D. Wedemeyer*, of Santa Ana, California, was on the brief, for the National Organization of Veterans' Advocates as amicus curiae.

Before FARLEY, IVERS, and STEINBERG, *Judges*.

IVERS, *Judge*, filed the opinion of the Court. FARLEY, *Judge*, filed a concurring opinion in which STEINBERG, *Judge*, joined in substantial part. STEINBERG, *Judge*, filed a dissenting opinion.

IVERS, *Judge*:  The veteran appeals the February 12, 1999, decision of the Board of Veterans' Appeals (BVA or Board) that denied entitlement to service connection for cardiovascular disease.  The Court's jurisdiction to review this matter is established by 38 U.S.C. § 7252.

## I.  FACTS

Veteran Shoffner served in the U.S. Army from September 1970 to February 1972.  Record (R.) at 14.  His service medical records (SMRs) show that he was hospitalized and treated as an outpatient, on three separate occasions over approximately two consecutive months, for bilateral

pneumonia with pleural effusion (fluid in the lining around the lungs) (R. at 27-28); and for mycoplasma pneumonia (most common form of primary atypical (irregular) pneumonia) with eosinophilia (staining of cells or structures); both of unknown etiology (R. at 31-33). *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY [hereinafter DORLAND'S] 531, 1307, 1317, 160, 563 (28th ed. 1994). His discharge physical profile record following his final hospitalization included the notation "resolving viral syndrome." R. at 38, 43.

The veteran filed a claim for service connection for pneumonia 4 years after his discharge. R. at 60-63. The VA regional office (RO) responded with a rating decision and letter to the veteran, which informed him that he had a service-connected disability, residuals of pneumonia, but that it was not compensable because no residuals were indicated on his discharge examination in January 1972. R. at 71-73. The record does not contain any evidence that the veteran appealed the RO decision.

In August 1984, the veteran suffered a myocardial infarction. *See* R. at 192. The report of a consulting physician includes an impression of atherosclerotic heart disease, status post acute inferiolateral wall myocardial infarction, and a Wenckebach heart block (type of irregular heart beat). *Id.*; *see* DORLAND'S 208. In April 1992, after receiving a diagnosis of ischemic cardiopathy (deficiency of blood supply to heart), the appellant underwent a heart transplant. R. at 164-66; *see* DORLAND'S 269, 861.

In October 1995, in support of a claim for service connection for his heart condition, the veteran submitted letters from three private physicians, each variously opining that, *if* the veteran's in-service pneumonia had been viral, it was possible that his heart condition was related to the pneumonia. R. at 255-57. In January 1996, the RO requested a VA medical examination for "Diseases of the Heart; Non TB Diseases/Injuries." R. at 407. The request is reproduced as a one-page document in the record on appeal, with a section for general remarks that stated as follows: "Cardiomyopathy, resulting in heart transplant, claimed as secodnary [sic] to pneumonia in service. Heart and pulmonary specialist, please, to review CPFile, including service meidcal [sic] records and letters from current MDs. Give opinion as to etiology of the vet's cardiomyopathy, as well as rationale." *Id*.

The first of two separate VA examinations concluded that, *if* the veteran's in-service

pneumonia had been viral, it could have contributed to his heart condition. R. at 409. The second did not draw a definite conclusion, but observed a history of severe viral syndrome in the 1970s, leading to post-viral cardiomyopathy. R. at 412.

A January 1996 RO decision denied service connection for cardiovascular disease. R. at 417-19. The reasons and bases section of the RO decision noted the suggestions by the veteran's three private physicians of a hypothetical link between his in-service pneumonia and his cardiomyopathy. R. at 417. The reasons and bases section did not reference the later VA examination, but stated the following concerning the first VA examination, conducted by a doctor named Pickering:

> The examiner opined that there is no doubt that the veteran's 1971 pneumonia may have been viral in nature, although this is impossible to document at this time. If it was indeed viral in nature, then it could easily have been a contributing factor to the development of viral cardiomyopathy. While viral infection of the cardiac muscle can result in an indolent process terminating in fatal cardiomyopathy, there will be no residual physical factors which would prove or disprove that hypothesis. The examiner further stated that it was unclear how the idea of repeated myocardial infarctions along with bypass grafting and angioplasties can relate to a purely viral cardiomyopathy.

R. at 418.

Shortly after the RO decision was issued, the veteran filed a Notice of Disagreement (NOD). R. at 421. During the adjudication that followed the NOD, one of the veteran's private physicians submitted three additional letters. R. at 449, 503, 536. In the first and third letters, the physician opined that the veteran's viral cardiomyopathy was related to the pneumonia that he had had while serving in Vietnam. R. at 449, 536. The second letter stated that the veteran's condition was "probable mycoplasma induced cardiomyopathy in addition to severe atherosclerotic coronary disease and an ischemic cardiomyopathy." R. at 503.

In June 1997, the RO sent a letter to the private physician asking him to clarify the etiology of the veteran's heart condition. R. at 549; *see* R. at 552. The record does not include evidence of a response from the physician. In October 1997, the RO sought "an opinion by a specialist in tropical diseases and by a specialist in diseases of the heart" (specialist's opinion) regarding the

3

etiology of the veteran's heart condition. R. at 560-62. A summary of the veteran's relevant medical history was included in the general remarks section of the request, with more detail than that in the January 1996 request for a VA medical examination. *See* R. at 407, 561-62. The 1997 request, in pertinent part, was as follows:

> (1) What is the most likely diagnosis of the type of pneumonia the veteran had in 1971?
>
> (2) [The veteran's private physician's] opinion seems to invert the progression of the veteran's heart disease. The evidence shows the progression of ASHD from the [sic] 1984 on whith [sic] cardiomyopathy and congestive heart failure developing later prior to the time of the heart transplant. Do the physicians see any evidence of a cardiomyopathy at the time of the early treatment in 1984 and 1985? Or did it develop later? And if so what is its cause? Is it as likely as not that the arteriosclerotic heart disease first diagnosed in 1984 is due to the bout of pneumonia in 1971 or it is [sic] more likely to be due to toher [sic] independent causes? Any opinion, one way or the other, must assess the factual situation in regard to the pneumonia in 1971, the absence of heart problems until 1984, and the diagnosis of ASHD in 1984, and later developments.

R. at 561-62.

A specialist physician from the VA outpatient clinic in Columbus, Ohio, provided the responding opinion, which concluded that the veteran's cardiomyopathy was due to ischemia that occurred after his myocardial infarction, and that his pneumonia had not caused the cardiomyopathy. R. at 557-58, 565. The RO then issued a Supplemental Statement of the Case reiterating its prior denial of service connection. R. at 564-73.

In February 1998, the veteran, noting more than one conclusion as to the etiology of his heart condition, requested that the Board obtain an independent medical opinion (IMO). R. at 575-76. The Board requested the IMO in a letter that provided relevant factual detail concerning the veteran's in-service pneumonia and subsequent heart conditions. R. at 596-597. The letter sought an opinion concerning "the issue of an etiological relationship between pneumonia and cardiomyopathy." R. at 597.

The Board noted, in the February 1999 decision presently on appeal, that the IMO provider

4

"reviewed the complete claims file and extensive medical records, as well as appropriate medical literature and references." R. at 6-7. The resulting IMO concluded that the veteran had an ischemic cardiomyopathy due to coronary atherosclerosis, with no evidence of any type of cardiomyopathy prior to his acute inferior lateral myocardial infarction in August 1984, with its clinical appearance on that date; and that the veteran had not had nonischemic cardiomyopathy or a chronic viral myocarditis. R. at 600-06.

After considering the IMO and all the evidence in the record, the Board concluded that the preponderance of the evidence was against the veteran's claim for service connection for his heart condition. It is that conclusion that the veteran now appeals.

## II. ANALYSIS

The Board's determination that the veteran's heart condition is not service connected was a factual finding, which the Court cannot overturn unless it was "clearly erroneous." *See Swann v. Brown*, 5 Vet.App. 229, 232 (1993); *Wood v. Derwinski*, 1 Vet.App. 190, 192 (1991). Under the "clearly erroneous" standard, "if there is a 'plausible' basis in the record for the factual determinations of the BVA, even if this Court might not have reached the same factual determinations, [the Court] cannot overturn them." *Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990). While this case involves much factual evidence from several different sources, in particular the medical evidence, the Court finds that there is a plausible basis for the Board's conclusion that the evidence preponderates against the veteran's claim for service connection.

The Board stated that it had reached its conclusion after "weighing competing medical opinions." R. at 7. As indicated in the preceding summary of the facts in this case, the record before the Board included medical opinions from several VA and non-VA physicians. The Board noted that the final IMO, obtained at the request of the veteran, was more probative than the opinions of the veteran's private treating physicians. *Id*. The Board pointed out that the IMO included comments concerning the prior opinions of the private and VA physicians. R. at 9.

The veteran has argued that the medical evidence before the RO at the time of its 1996 decision affirmatively supported his claim for service connection. Appellant's Brief (Br.) at 11. The veteran would have the Court characterize the medical evidence as conclusive regarding etiology,

and reverse the Board's decision. The remedy of reversal, however, is only appropriate when "'[t]here is absolutely no plausible basis' for the BVA's decision and where that decision 'is clearly erroneous in light of the *uncontroverted* evidence in the appellant's favor.'" *Hicks v. Brown*, 8 Vet.App. 417, 422 (1995), (quoting *Hersey v. Derwinski*, 2 Vet.App. 91, 95 (1992)) (emphasis added).

The Court has found that there is a plausible basis in the record for the Board's denial of service connection. The Court cannot find, as the veteran urges, that the medical evidence in the record at the time of the 1996 RO decision was conclusively in favor of service connection. The Board discussed this medical evidence, and found that it was "inconclusive as to the etiological relationship between the [veteran's in-service] pneumonia and [his] cardiomyopathy." R. at 7. Nothing in the evidence of record refutes these findings. The question of whether the evidence was uncontroverted is not relevant because the evidence was not conclusive.

The veteran argues that the Secretary unlawfully overdeveloped the veteran's claim by seeking medical opinions beyond those that were before the RO for its 1996 decision. Appellant's Br. at 11-15. This argument is without the support of law, contrary to the veteran's assertions otherwise. He contends that the language of 38 C.F.R. § 3.304(c) limits VA's development of evidence. In fact, that language gives VA the discretion to determine how much development is necessary for a determination of service connection to be made. 38 C.F.R. § 3.304(c) ("The development of evidence in connection with claims for service connection will be accomplished *when deemed necessary*." (Emphasis added)).

Furthermore, the RO complied with its statutory duty following receipt of the veteran's NOD. *See* 38 U.S.C. § 7105(d)(1); 38 C.F.R. § 19.26. That is, the RO took "such development or review action as it deem[ed] proper under the provisions of regulations not inconsistent with this title." 38 U.S.C. § 7105(d)(1). After receiving different letters from one of the veteran's private physicians, and finding inconsistent information in those letters concerning the etiology of the veteran's heart condition, the RO sought clarification from the private physician. *See* R. at 449, 503, 536, 549, 552. Receiving no response from the private physician, the RO sought a VA specialist's opinion concerning etiology. *See* R. at 557-62.

The veteran acknowledged in his brief that the law allows for an RO to request an IMO when

6

a claim involves medical complexity or controversy. *See* Appellant's Br. at 13; 38 U.S.C. § 5109; 38 C.F.R. § 3.328. Although the specialist's opinion that the RO sought was not an IMO, because it was provided by a VA physician, it was sought to clarify a question of etiology left open by the non-VA medical evidence of record. Whether an IMO is needed is left to the Secretary's discretion. 38 U.S.C. § 5109(a). Similarly, the Board has discretionary authority to request an IMO. 38 U.S.C. § 7109(a); *see* 38 C.F.R. § 20.901(d).

The veteran has argued that both the RO request for a specialist's opinion and the Board's request for an IMO were tainted because of certain details provided in the request letters. Although this argument was not discussed in the Board decision, it is relevant to the issue on appeal, i.e., whether the Board correctly denied service connection, and the Court will address the argument in the first instance. *See Maggitt v. West*, 202 F.3d 1370 (Fed. Cir. 2000).

The Court finds that the Board's silence concerning the RO letter requesting a specialist's opinion was not arbitrary or capricious. *See* 38 U.S.C. § 7261(a)(3). The RO made the request after the veteran had submitted an NOD. At that point in the processing of the veteran's claim, the RO exercised its statutory authority in deeming it proper to issue a request for a specialist's opinion. *See* 38 U.S.C. § 7105(d)(1); 38 C.F.R. § 19.26. The Secretary has not promulgated a regulation governing requests for a VA specialist's opinion, but has done so for RO requests for IMOs. *See* 38 C.F.R. § 3.328(b) (request must be submitted in writing and must set forth in detail the reasons why the opinion is necessary). Although the Court could draw a parallel between the regulatory provisions for requesting an IMO and the request for a specialist's opinion in this case, we need not address that issue to resolve this appeal.

Whether the RO's request for a specialist's opinion was tainted, as the veteran has alleged, or not tainted, the only outcomes for the veteran at that time would have been (1) a grant of service connection following the RO's second look, or (2) the transfer of his case to the Board for a decision concerning his appeal. *See* 38 U.S.C. § 7105(d)(1). The latter occurred, and the Board requested an IMO, which it ultimately relied upon as the basis for its conclusive decision concerning the veteran's claim for service connection. Assuming, arguendo, that the RO request for a specialist's opinion was tainted, the resulting opinion was not a decisive factor in the Board's decision. The Court must proceed, then, to determine whether the Board's request for an IMO was tainted, as the

veteran argues it was.

A letter from the Board requesting an IMO must "fully and accurately reflect[ ] the disability picture, including both objectively demonstrated disabilities and subjectively claimed pain or other disability." *Bielby v. Brown*, 7 Vet.App. 260, 268-69 (1994).

> "If the engagement letter fails to set forth all of the claimant's impairments, both objective and subjective, or fails to set forth any other relevant factual detail, such as the time period during which symptomatology manifested itself, the [independent medical expert] cannot render an opinion which is supported by a sufficient prior review of and plausible basis in the record."

*Id*.; *see* 38 U.S.C. § 7109(a); 38 C.F.R. § 20.901(d).

The Court notes the Board's finding that the IMO it had requested was a "clear and unequivocal opinion," the basis for which included a review of each of the veteran's physician's opinions. R. at 7. Based on the Board's factual findings concerning the IMO, and the requirement that a letter requesting an IMO consist of sufficient detailed information, the Court concludes that the Board did not act in an arbitrary or capricious manner by issuing the letter requesting an IMO. *See* 38 U.S.C. § 7261(a)(3).

The veteran has alleged further that the Board should have returned his claim to the RO to seek further comments from two VA doctors who examined him when he initially submitted his claim. Appellant's Br. at 19-21. He argues that this action is required pursuant to 38 C.F.R. § 4.2, which he asserts obliged the RO to return the doctors' reports for clarification. Appellant's Br. at 20.

The regulatory provision relied upon by the veteran is inapplicable for this appeal. The provision appears in the part of the regulations governing evaluation of service-connected disabilities for appropriate compensation. *See* 38 C.F.R. § 4.1. The veteran's appeal involves a denial of service connection, and his underlying claim had not reached the threshold of part 4 of the regulations. *Cf. Barela v. West*, 11 Vet.App. 280, 283 (1998) (question of service connection is separate and distinct from question of compensation).

Finally, the Secretary has argued that a remand is required in this case, in light of "the Court's decision in [*Holliday v. Principi*, 14 Vet.App. 280 (2001)], which interpreted the provisions of the Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000)

8

(VCAA)." Secretary's Br. at 17-20. The veteran has replied to this argument by stating that while he "does not dispute that, if the Court does not reverse, then a VCAA remand is appropriate, it is his position that the Court may not grant a VCAA remand in lieu of addressing and deciding the legal errors properly presented for review in the [veteran's] principal brief." Appellant's Reply Br. at 12.

Before the issuance of this opinion, the U. S. Court of Appeals for the Federal Circuit (Federal Circuit) issued two decisions relevant to whether a VCAA remand is required for the present appeal. *See Bernklau v. Principi*, 291 F.3d 795 (Fed. Cir. 2002); *Dyment v. Principi*, 287 F.3d 1377 (Fed. Cir. 2002). In each decision, the Federal Circuit held that the sections of the VCAA codified at 38 U.S.C. §§ 5102, 5103, and 5103A, concerning notice and assistance VA is to provide to claimants, are not retroactively applicable to proceedings that were complete before VA and were on appeal to this Court or the Federal Circuit when the VCAA was enacted. *See Bernklau*, *supra*.

The Board decision on appeal in the present case was issued on February 12, 1999, almost two years before the November 2000 enactment of the VCAA. The Court concludes, therefore, that a remand for the Board to consider the matters on appeal in light of the sections of the VCAA codified at 38 U.S.C. §§ 5102, 5103, and 5103A is *not* required. *See Bernklau* and *Dyment*, both *supra*. The remaining sections of the VCAA are not implicated in this appeal. In particular, the appeal does not raise issues regarding well groundedness or the benefit-of-the-doubt doctrine. *See*, *e.g.*, 38 U.S.C. § 5107; *see generally Dela Cruz v. Principi*, 15 Vet.App. 143, 148-49 (2001) (finding that VCAA did not change benefit-of-the-doubt doctrine); *Luyster v. Gober*, 14 Vet.App. 186 (2000) (recognizing that VCAA required remand for readjudication if claim had been denied as not well grounded).

The Court holds that the Board's denial of service connection for the veteran's heart condition was not "clearly erroneous." *See Swann*, *Wood*, and *Gilbert*, all *supra*. The Court is satisfied that the Board has provided adequate reasons or bases in support of its decision. *See* 38 U.S.C. § 7104(d); *Gilbert*, 1 Vet.App. at 56-57.

## III. CONCLUSION

Accordingly, upon consideration of the oral argument, and of the record and the pleadings filed for this appeal, for the reasons stated herein, the February 12, 1999, BVA decision is AFFIRMED.

FARLEY, *Judge*, with whom STEINBERG, *Judge*, joins in substantial part, *concurring*: Section 3.304(c) of title 38, Code of Federal Regulations provides:

> The development of evidence in connection with claims for service connection will be accomplished when deemed necessary but it should not be undertaken when evidence present is sufficient for this determination.

38 C.F.R. § 3.304(c). When the RO rendered its initial decision in this matter, it had before it (1) the statements of three private physicians who opined that if the veteran had suffered from viral pneumonia, it was possible that his heart condition was related to the pneumonia; and (2) two VA examination reports that also vaguely concluded that viral pneumonia, if that is what the veteran suffered from during service, could possibly have caused his heart condition. As § 3.304(c) limits claim development to situations where the evidence present is insufficient to determine service connection and because the RO stated that the evidence was merely "speculative," the RO had the authority, and arguably the obligation (*see* 38 C.F.R. § 4.2), to further develop the evidence at that point. *See also* VA PROCEDURE ADJUDICATION MANUAL, M21-1, Pt. 6, ch. 2, para. 2.09. Instead, the RO denied service connection, finding the opinions of record to be "speculative at best." R. at 418.

It was error for the RO to deny service connection on the record before it. The veteran understandably appealed the denial, submitting additional letters from one of his private physicians. Although these letters provided further support for the veteran's contention that his service-connected pneumonia caused his heart condition, they too were far from conclusive. Finding the evidence insufficient to warrant a grant of service connection, the RO sought the opinion of a third VA doctor (Dr. Wu) as to the etiology of the appellant's heart condition. Dr. Wu concluded that the veteran's pneumonia was not the cause of his heart condition. On the basis of this evidence, the RO's denial of service connection was continued. R. at 564-73.

The veteran continued to disagree with the RO's decision, and the matter was sent to the Board. If the Board had denied the claim on the same record that was before the RO, the Court would have had to vacate the Board's decision and remand the matter; the Board, however, did not repeat or continue the errors of the RO. In fact, and at the request and with the encouragement of the appellant, the Board attempted to resolve the incomplete and inconsistent medical opinions in

the record by obtaining a complete, thorough, and well-reasoned IMO by Dr. Hendrix, which it was authorized to do pursuant to 38 U.S.C. § 7109.  *See also* 38 C.F.R. § 20.901(d); 38 C.F.R. § 19.9(b) (2001) (Board may obtain IMOs without first remanding the matter to the agency of original jurisdiction).  Dr. Hendrix opined that the veteran's heart condition was not causally related to his service-connected pneumonia.

Even assuming that the RO erred in initially denying the claim without further development and in the way it developed evidence, neither the RO nor the Board *exceeded* its authority or responsibility in the development of evidence.  Any errors committed by the RO in the *underdevelopment* of this case were cured by the IMO obtained by the Board and the RO's decision was subsumed by the Board's decision. 38 C.F.R. § 20.1104 (2001).  This Court's jurisdiction is limited to the review of *Board decisions*, and Dr. Hendrix's opinion constitutes a plausible basis for the Board's decision denying service connection.  38 U.S.C. § 7252(a).  For these reasons, the decision of the Board must be affirmed and thus I concur.


STEINBERG, *Judge*, dissenting:  I cannot join in the majority opinion because, although I agree with the result it reaches as to the arguments **raised by the parties**, I do not agree with the rationale used by the majority to obtain this result; moreover, I do not believe that this case is yet ripe for a panel decision and thus cannot agree that the Board of Veterans' Appeals (Board) decision should be affirmed.  I do, however, join in all but the last two sentences of Judge Farley's excellent concurring opinion, which I believe presents the proper analysis as to the arguments raised by the parties.  I cannot join, however, in his conclusion agreeing with the majority's affirmance because, in my view, that conclusion is premature in that there are two issues not addressed by the parties that need briefing and thorough analysis by the Court.


### I. Effect of VA Regulations Amendments

First, although the majority correctly states the holdings of the *Bernklau* and *Dyment*

11

opinions,[1] it fails either to consider or to request the parties to consider the possible effects of the Department of Veterans Affairs (VA) "Duty to Assist" regulations adopted on August 29, 2001, in connection with the enactment of the Veterans Claims Assistance Act of 2000.[2]  I have set forth the reasons for the propriety of seeking additional briefing from the parties on this issue in my separate statements in *Stephens (J.B.) v. Principi*, __ Vet.App. ___, ___, No. 00-1516, slip. op. at 3-5, 2002 WL 1470603, at *2-3 (July 10, 2002), and *Kuzma v. Principi*, __ Vet.App. ___, ___, No. 98-295, slip op. at 1-5, 2002 WL 1581042, *1-3 (July 18, 2002) (en banc), and, for the reasons expressed there, I believe that the Court should likewise seek briefing in this case.

## II. Effect of VA Manual Provisions

Another matter that I believe warrants further briefing and consideration is paragraph 2.01 b. of part 6, chapter 2, of the VA Adjudication Procedure Manual, M21-1 [hereinafter Manual M21-1], which defines the scope of the part 6, chapter 2 ("Rating Activity"), provisions as applicable to "[r]ating decisions . . . on the following major issues relating to entitlement:  [S]ervice connection for diseases and injuries".  Paragraph 2.09 then goes on to direct adjudicators as follows:

> a.  **VA Examinations.**  If a VA report of examination (including VA Form 21-2680, "Examination of Housebound Status or Permanent Need for Regular Aid and Attendance") is inadequate in any essential particular, the reasons for inadequacy ***will be outlined*** and the report ***returned*** through channels for a corrected supplementary report or for reexamination.  See also chapter 1.

> b.  **VA Hospitalization.**  In the event a VA report of hospitalization is found to be inadequate in the following types of cases, ***request*** the original clinical records, including nurses' and doctors' orders:
>> (1) Cases involving injury or aggravation of injury or death as the result of hospitalization, medical or surgical treatment[,] or examination.

---

[1] *Bernklau v. Principi*, 291 F.3d 795 (Fed.Cir. 2002); *Dyment v. Principi*, 287 F.3d 1377 (Fed.Cir. 2002); *see also Stephens (J.B.) v. Principi*, __ Vet.App.__,__, No. 00-1516, slip op. at 3-5, 2002 WL 1470603, at *2 (July 10, 2002) (Steinberg, J., concurring in part and dissenting in part).

[2] Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (VCAA).  *See* 66 Fed. Reg. 45,620, 45,630-32 (Aug. 29, 2001) ("Duty to Assist" regulations, amending 38 C.F.R. §§ 3.102, 3.156, 3.159, 3.326); *see also Stephens (J.B.)*, *supra*.

(2) Death cases if the veteran, who died from a non[-]service-connected cause, had a service-connected neuropsychiatric disability that reasonably may have impeded, obstructed, or otherwise interfered with treatment for the condition that caused death, but the report does not clarify this issue.

c. **Non-VA Facilities.** If a report from a [s]tate, county, municipal, contract, or recognized private institution or hospital is inadequate in any essential particular, *request* clarification, and if a satisfactory corrected report cannot be obtained within a reasonable period of time, *authorize* a VA examination.

Manual M21-1, pt. 6, ch. 2, para. 2.09 (emphasis added). This Court has held that Manual M21-1 provisions that "are substantive rules are 'the equivalent of [VA] regulations'", have regulatory force, and must be complied with in the VA adjudicatory process.[3]

The above provisions appear to set forth unequivocal commands to VA adjudicators rather than general guidance and exhortation. In this case, the Board described Dr. Patel's report, inter alia, as follows: "The examination report was unremarkable and the examiner offered no opinion regarding the etiology of the veteran's cardiovascular disability, other than to note the previous history, as reported by the veteran. There is no indication that the service medical records were actually reviewed." Record (R.) at 5-6. The Secretary notes in his brief the lack of any statement regarding etiology in Dr. Patel's report and further notes that the report failed to provide a rationale to support its statement as to "post viral cardiomyopathy". Secretary's Brief at 23. Although the Secretary argues that subsequent statements (R. at 503, 536) by the appellant's private physician, Dr. Goulder, were strong enough to obviate the need for clarification from Dr. Patel (*ibid*.), such a rationale appears questionable in light of Manual M21-1 para. 2.09's directions and in light of the fact that the RO had sought but had not received clarification from Dr. Goulder (R. at 549). Because Dr. Patel appears to have conducted the examination on the basis of a contract from VA (*see* R. at 411-12), Manual M21-1 para. 2.09 c. appears to be applicable and, if so, would require that the VA

---

[3] *Patton v. West*, 12 Vet.App. 272, 277 (1999) (quoting *Cohen (Douglas) v. Brown*, 10 Vet. App 128, 139 (1997), and citing *Smith (Bernard) v. Brown*, 10 Vet.App. 44, 48 (1996); *Hayes v. Brown*, 6 Vet.App. 66, 67 (1993); *Dixon v. Derwinski*, 3 Vet.App. 261, 263 (1992); and *Fugere v. Derwinski*, 1 Vet. App. 103, 109 (1990)).

regional office (RO) involved "request clarification, and if a satisfactory corrected report cannot be obtained within a reasonable period of time, authorize a VA examination". It appears unlikely that Dr. Wu's examination (R. at 557-58) would be the "clarifying" examination as to Dr. Patel's examination, because it was requested after the unanswered request for clarification from **Dr. Goulder** and made no reference to Dr. Patel's examination. Also, it does not seem at all clear that Dr. Wu ever conducted an **examination** of the veteran. *See* R. at 554 (referral letter stating: "Examination is not required").

Furthermore, if Dr. Patel is to be considered to have conducted a **VA** examination, Manual M21-1 para. 2.09 a. appears to apply and would require either an outline of "the reasons for [the] inadequacy" of the examination and a return of the report to Dr. Patel or a reexamination of the veteran. The record on appeal does not appear to contain any such outline of reasons by the RO (*see* R. at 1-614), and it appears that the report was not returned to Dr. Patel for "a corrected supplementary report", as required by Manual M21-1, para 2.09 a. For the same reasons set forth above as to Manual M21-1 para. 2.09 c., there appears to be no indication that Dr. Wu's report was a Manual M21-1 para. 2.09-required reexamination. Moreover, Dr. Hendrix's independent medical opinion (IMO) likely could not qualify here because, even if there were an outline, he did not conduct an examination of the veteran. R. at 596-98.

When the case reached the Board, once it found that Dr. Patel's report was inadequate the Board may well have had an obligation under 38 C.F.R. § 19.9(a) (1998) to remand the appellant's claim to the RO for correction of a "procedural defect" under Manual M21-1 para. 2.09.[4]  However,

---

[4] I recognize that 38 C.F.R § 19.9 does not impose an absolute obligation, but it does require the Board of Veterans' Appeals (Board) to exercise its judgment as to whether a "procedural defect" must be corrected in order for the Board to make "a proper appellate decision" on the facts of a particular case. Perhaps in this case the Board might find that Dr. Hendrix's independent medical opinion (IMO) obviated the need for a remand under § 19.9 (it appears, as Judge Farley concludes in his concurring opinion, that paragraph (b)(1) of the regulation does qualify the mandate in paragraph (a) by permitting the Board to seek an IMO under 38 C.F.R. § 20.901 (1997) rather than remanding), but that is a matter to be addressed by the Board, and not the Court, in the first instance, *see Elkins v. Gober*, 229 F.3d 1369, 1377 (Fed. Cir. 2000) ("[f]act-finding in veterans cases is to be done by the expert BVA, not by the Veterans Court"); *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) (noting "the general rule that appellate tribunals are not appropriate fora for initial fact finding"); *Neumann v. West*, 14 Vet.App. 12, 21 (2000) (quoting *Hensley*, *supra*, and concluding that, although "the Court may reverse an incorrect judgment of law which is based upon proper factual findings, 'it should not simply [make] factual findings on its own'"); *Teten v. West*, 13 Vet.App. 560, 564 (2000), and here the Board in its February 1999 decision not only did not address the M21-1 provisions but also did not address § 19.9.

14

this and the other questions raised above concerning compliance with the Manual M21-1 should properly be addressed first by the parties and then examined fully by the Court.

Because the Court has proceeded to issue an opinion in this case without seeking additional briefing or considering fully the above issues, I cannot join in the majority opinion nor join fully in the concurring opinion.  I respectfully dissent.